IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BLISSFUL ENTERPRISES, Inc. | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-18-1221 |
| CINCINNATI INSURANCE COMPANY, | * | |
| | * | |
| Defendant. | | |

*****

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Cincinnati Insurance Company's ("Cincinnati") Motion for Summary Judgment (ECF No. 21) and Plaintiff Blissful Enterprises, Inc.'s ("Blissful") Opposition to Defendant's Motion for Summary Judgment and Cross-Motion for Summary Judgment ("Cross-Motion") (ECF No. 23). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant Cincinnati's Motion and deny Blissful's Motion.

### I. BACKGROUND[1]

Blissful owns and operates a hotel (the "Hotel") at 2112 Emmorton Park Road in Edgewood, Maryland (the "Property"). (Compl. ¶¶ 1, 11, ECF No. 2). Blissful insured the

---

[1] Unless otherwise noted, the facts outlined here are set forth in Blissful's Complaint (ECF No. 2). To the extent the Court discusses facts that Blissful does not allege in its Complaint, they are uncontroverted and the Court views them in the light most favorable to the non-moving party. The Court will address additional facts when discussing applicable law.

Property via a policy issued by Cincinnati (the "Policy"). (Id. ¶ 11; id. Ex. 1 ["Policy"], ECF No. 2-1).[2] The Policy provides All Risk Coverage, or Open Peril coverage, that is, coverage for all risk of loss unless excluded by the Policy. (Id. ¶ 13). Blissful purchased additional coverage included in a Hotel Commercial Property Endorsement (the "Endorsement"). (Compl. ¶ 20; Policy at 82–102). The Property contains a storm water drainage system connected to the Hotel that "drains water from around the building, and water from off the roof of the building, through a system of pipes which feed into an underground pipe." (Id. ¶ 23).

On January 14, 2016,[3] Blissful employees cleaning up leaves on the Property noticed what appeared to be a "sinkhole" next to the building. (Gregory Aff. ¶ 6, ECF No. 21-5; Def.'s Mot. Summ. J. ["Def.'s Mot."] Ex. 1(A) ["Cincinnati Claim Notes"] at 8, ECF No. 21-6).[4] Blissful reported the incident (the "Loss") to Cincinnati, stating that underground pipes may be damaged. (Id.; Compl. ¶ 29). On January 20, 2016, John Gregory, a Cincinnati Senior Claims Specialist, sent Blissful a Reservation of Rights letter and noted that, "if there are damages to underground pipes, drains, or flues, they must be physically attached to Covered Property for the policy to respond." (Gregory Aff. ¶ 8; Cincinnati Claim Notes at 8). Blissful retained William Baker to investigate the loss and attached to its insurance claim his February 3, 2016 letter, which stated that a "metal pipe

---

[2] Citations to the Policy refer to the pagination the Court's Case Management / Electronic Case Files ("CM/ECF") assigned.

[3] Blissful's Opposition states the date was January 13, 2016. (Pl.'s Opp'n & Cross-Motion Summ J. at 3, ECF No. 23)

[4] Citations to the Cincinnati Claim Notes refer to the CM/ECF pagination.

has failed at the connection to the existing concrete manhole [which resulted in] a large amount of soil be[ing] displace[d] down the pipe, . . . caus[ing] two small retaining walls to fail and to void soil from under concrete and stone inlet aprons located in a drainage swale." (Def.'s Mot. Ex 1(C) ["Baker Letter"], ECF No. 21-8). Baker referred to the loss as a "sinkhole." (Id.). In a February 4, 2016 email, Gregory emailed a Blissful representative this statement: "based on the engineer's report and hotel site plan, we will provide coverage for the underground piping, however, as you are aware, the policy will not respond to filling the sinkhole itself." (Compl. ¶ 30; Cincinnati Claim Notes at 11). Blissful then submitted an estimate (the "Estimate") of the repair and restoration cost, $335,484.00, (Compl. ¶ 31; id. Ex. 2 ["Estimate"], ECF No. 2-2). Surprised by the repair cost, Cincinnati chose to inspect the loss and evaluate the proposal. (Gregory Aff. ¶ 16). Upon investigation, Cincinnati wrote to Baker, asking him to explain how the loss satisfied the Policy's definition of "sinkhole." (Cincinnati Claim Notes at 29–30). Baker could not confirm that it was, in fact, a sinkhole, so Cincinnati and Blissful each retained an expert, and the parties arranged a joint inspection of the Property for May 23, 2016. (Gregory Aff. ¶¶ 18–21). Following the inspection, Blissful's expert, Robert Najewicz, reported that "the bottom portion of the metal pipe was significantly corroded resulting in a loss in the structural integrity of the pipe that in turn appears to have contributed to the lateral deflection or shearing in the pipe and its subsequent collapse." (Def.'s Mot. Ex. 2 ["Najewicz Report"] at 2, ECF No. 21-12). Cincinnati's expert, August Domel, agreed that "[t]he hole has occurred because of a breach in the pipe where it connects to the manhole has resulted in soil movement," which "allowed for the soil in the area to enter the pipe

3

and be transported away leaving a hole." (Def.'s Mot. Ex. 1(E) ["Domel Report"] at 4, ECF No. 21-10). Domel disputed Baker's sinkhole characterization because a sinkhole is "a ground depression caused by the dissolving of soft rocks naturally by groundwater circulating through them," whereas the Loss was related to pipe collapse. (Id.). On August 1, 2016, having concluded the loss was not actually a sinkhole or otherwise covered, Cincinnati denied Blissful's claim. (Compl. ¶ 32; Gregory Aff. ¶ 25).

On or about March 23, 2018, Blissful sued Cincinnati in the Circuit Court for Harford County, Maryland. (Not. Removal at 1, ECF No. 1). In its two-count Complaint, Blissful alleges: breach of contract (Count I); and, in the alternative, promissory estoppel (Count II). Blissful alleges the underground pipe "collapsed due to decay hidden from view, and/or due to defective material or methods by which the pipe was installed, or due to breaking apart of the drain system." (Compl. ¶ 24). "Alternatively the area containing the underground pipe sustained sinkhole damage for which Cincinnati agreed coverage existed under the Policy." (Id. ¶ 25). Blissful alleges the Loss is covered by the Policy's Collapse Coverage Extension, (id. ¶¶ 17–19), or via the Endorsement's coverage for underground pipes, flues or drains, (id. ¶¶ 20–22).

On April 26, 2018, Cincinnati removed the case to this Court. (ECF No. 1). On December 11, 2018, Cincinnati filed its Motion for Summary Judgment. (ECF No. 21). On January 2, 2019, Blissful filed an Opposition and Cross-Motion for Summary Judgment. (ECF No. 23). On January 22, 2019, Cincinnati filed an Opposition to the Cross-Motion and Reply with respect to its Motion. (ECF No. 24). On January 31, 2019, Blissful filed a Reply. (ECF No. 25).

4

## II. DISCUSSION

### A. Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

When the parties have filed cross-motions for summary judgment, the court must "review each motion separately on its own merits to 'determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). Moreover, "[w]hen considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." Id. (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)). The Court, however, must also abide by its "affirmative obligation" to "prevent factually unsupported claims and defenses" from

going to trial. Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987)). If the evidence presented by the nonmovant is merely colorable, or is not significantly probative, summary judgment must be granted. Anderson, 477 U.S. at 249–50.

**B.    Analysis**

Cincinnati argues that the Policy does not cover the Loss, regardless of which coverage part Blissful cites in support of its claim. Cincinnati also argues that it is not estopped from asserting Policy defenses and that Blissful should not be permitted to claim damages for a retaining wall. Blissful maintains the Policy covers the Loss, either under the Collapse Coverage Extension or the Hotel Commercial Property Endorsement's Underground Property Extension, that Cincinnati is estopped, and that the Court should allow the retaining wall to be part of its claim. At bottom, the Court agrees with Cincinnati.

Because it will focus the analysis that follows, the Court will first address the retaining wall issue.

**1.    Retaining Wall**

In its Cross-Motion, Blissful argues that the retaining wall that was destroyed is included in the Loss coverage because it was mentioned in discovery and that the Court should therefore award it the "undisputed amount of loss in this case," $335,484.00. (Pl.'s Mot. at 3, 35). Cincinnati moves to strike the reference to the retaining wall because Blissful did not allege damages to the retaining wall in its Complaint, its expert does not mention it in his report, and Blissful has made no damages claim for it. The Court agrees with Cincinnati.

7

A plaintiff is "bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint." Zachair, Ltd. v. Driggs, 965 F.Supp. 741, 748 n.4 (D.Md. 1997) aff'd, 141 F.3d 1162 (4th Cir. 1998); see also Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 F.App'x 556, 563 (4th Cir. 2008) ("plaintiffs may not raise new claims without amending their complaints after discovery has begun").

Here, the Complaint does not mention a retaining wall and instead focuses on the damage to and replacement of the underground pipe. The Complaint alleges Cincinnati agreed to pay for the Loss and includes a screenshot of Gregory's February 4, 2016 email to Blissful's Mike Patel, in which Gregory states that Cincinnati will cover the underground piping but not will fill in the sinkhole. (Compl. ¶¶ 27–30). In the next paragraph, the Complaint refers to the Estimate that Blissful submitted to Cincinnati in 2016 and attached to the Complaint as Exhibit 2. Titled "Comfort Inn Storm Drain Pipe Replacement," the Estimate states the cost of the work would be $335,484.00 and contains no reference to a retaining wall. (Id. Ex. 2 at 1). In its next paragraph, the Complaint refers to Cincinnati's denial of the claim, a letter which also focuses on "the cost of pipe replacement and soil backfill" at the Property. (Def.'s Mot. Ex. 1(F) ["Claim Denial Letter"] at 1, ECF No. 21-11). Blissful's failure to specify that their underground pipe claim also included damage to a retaining wall deprived Cincinnati of adequate notice under Rule 8. See Fed.R.Civ.P. 8(a)(2) ("a short and plain statement of the claim showing that pleader is entitled to relief"). Blissful notes that the retaining wall is mentioned in response to Cincinnati's Requests for Admissions, in a statement by Patel, and in Baker's February 3, 2016 letter. But Cincinnati

8

should not have to guess what damages Blissful is claiming. The pre-suit correspondence, save for the Baker letter, concerned the underground pipes and the hole. If Blissful meant to include the retaining wall in its claim for damages, it should have made that clear in its Complaint. As a result, the Court will deny Blissful's Motion as to the retaining wall.

The Court will next turn to the Policy and the coverage parts under which Blissful claims coverage.

### 2. Coverage under the Policy

Under Maryland law, "insurance policies are interpreted in the same manner as contracts generally." Catalina Enters., Inc. Pension Tr. v. Hartford Fire Ins. Co., 67 F.3d 63, 65 (4th Cir. 1995) (citing Collier v. MD–Individual Practice Ass'n, 607 A.2d 537, 539 (Md. 1992). Unlike some states, Maryland does not require courts to construe insurance policies against the insurer. Id. Courts should instead "ascertain and give effect to the intentions of the parties at the time of contracting." Id. (first citing Schuler v. Erie Ins. Exch., 568 A.2d 873, 877 (Md.Ct.Spec.App. 1990); then citing Aragona v. St. Paul Fire and Marine Ins. Co., 378 A.2d 1346, 1348 (Md. 1977). To that end, the court must "construe the instrument as a whole," id. (quoting Collier, 607 A.2d at 539), and as much as possible, "give effect to each clause of an insurance policy, and avoid treating [any] term as surplusage." Rigby v. Allstate Indem. Co., 123 A.3d 592, 597 (Md. 2015) (citing Connors v. Gov't Emps. Ins. Co., 113 A.2d 595, 603 (Md. 2015). Besides the contract language, "the court may look to the character of the contract, its object and purposes, and the factual circumstances of the parties at the time of execution." Catalina Enters., 67 F.3d at 65 (quoting Collier, 607 A.2d at 539). "[I]f an insurance policy is ambiguous, it will be

9

construed liberally in favor of the insured and against the insurer as drafter of the instrument." Dutta v. State Farm Ins. Co., 769 A.2d 948, 957 (Md. 2001) (quoting Empire Fire & Marine Ins. Co. v. Liberty Mutual Ins. Co., 699 A.2d 482, 494 (Md.Ct.Spec.App. 1997)). Unambiguous language, "however, must be enforced as written." Catalina Enterprises, 67 F.3d at 65 (citing Bd. of Trs. of State Colls. v. Sherman, 373 A.2d 626, 629 (Md. 1977)). Unless there is an indication that the parties intended to use words in a special, technical sense, the words in a policy should be accorded their "usual, ordinary, and accepted meaning." Id. (quoting Bausch & Lomb, Inc. v. Utica Mutual Ins. Co., 625 A.2d 1021, 1031 (Md. 1993)). Under Maryland law, it is the insurer's burden to prove the applicability of an exclusion from coverage. Trice, Geary & Myers, LLC v. Camico Mut. Ins. Co., 459 F.App'x 266, 274 (4th Cir. 2011) (citing ACE Am. Ins. Co. v. Ascend One Corp., 570 F.Supp.2d 789, 798 (D.Md. 2008)).

Here, the main coverage form of the Policy is the Building and Personal Property Coverage Form ("BPP Form"). (Policy at 21–35). Its major sections, which govern coverage, are Covered Property, Property Not Covered, Covered Causes of Loss, and "Additional Coverages and Coverage Extensions." (Id.). The Endorsement that Blissful purchased references and interacts with the BPP Form to determine what losses are covered. Exactly how the terms of the Endorsement and the terms of the BPP interact is at the heart of this case. The Court first examines whether the Policy's Collapse Coverage Extension covers Blissful's loss.

### a. Coverage under the Collapse Coverage Extension

Under the Collapse Coverage Extension, which appears under Section 5 (Coverage Extensions), the Policy states:

> We will pay for "loss" to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Part, if the collapse was caused by one or more of the following:
> …
> (a) Decay that is hidden from view…

(Policy at 39). Cincinnati accepts that the collapse at issue was caused by decay but challenges that the collapse caused a loss to Covered Property.

As defined in the Policy, Covered Property does not include "[u]nderground, pipes, flues, or drains." (Policy at 24). Blissful, however, argues that the Collapse Coverage Extension covers the Loss of the underground pipes because the Underground Property Coverage Extension, which is included in the Endorsement Blissful added to the Policy, covers underground pipes attached to the building. But that misreads the operation of the Underground Property Coverage Extension, applying one of its special provisions to the Policy as a whole. The Underground Property Coverage Extension states:

> <u>For this Coverage Extension</u>, Section A. Coverage, 2. Property not Covered, n. Underground Pipes, Flues, or Drains is deleted in its entirety and replaced by the following:
> n. Underground Pipes, Flues, or Drains[:] Underground pipes, flues, or drains, except as provided in Section A. Coverage, 5. Coverage Extensions.

(Policy at 101) (emphasis added). The phrase, "[f]or this Coverage Extension" clearly shows the drafters of the Policy intended for the specified substitution only to apply to the Underground Property Coverage Extension, not other extensions, like the Collapse Coverage Extension. Reading the Underground Property Extension's substitution language

11

the way Blissful urges, to apply to the entire Policy or to differentiate between attached and unattached pipes, would render the phrase, "[f]or this Coverage Extension," and the other subparts of the Underground Property Extension surplusage. See Rigby, 123 A.3d at 597.

### b. Coverage under the Underground Property Coverage Extension

The Underground Property Coverage Extension states that:

> We will pay for "loss" resulting from any of the Covered Causes of Loss to:
> …
> (b) Underground pipes, flues, or drains if they are attached to Covered Property.

(Policy at 100). With respect to potential coverage under this Extension, Cincinnati argues that the damage to the underground pipes did not result from a Covered Cause of Loss, which Blissful disputes.

Under the Policy, a Covered Cause of Loss is any "RISK OF DIRECT PHYSICAL LOSS unless the 'loss' is . . . excluded." (Id. at 25). Cincinnati identifies two exclusions and one exception to an exclusion that it contends are relevant here: (1) one concerning losses caused by "[r]ust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself" ("Corrosion Exclusion"), (id. at 27); (2) one concerning "earth movement" ("Earth Movement Exclusion"), (id. at 25–26); and (3) one concerning "sinkholes" ("Sinkhole Exclusion Exception"), (id.).

#### i. Corrosion Exclusion

The prefatory language for the list of exclusions that includes the Corrosion Exclusion is: "We will not pay for 'loss' caused by or resulting from any of the following:"

12

(Policy at 27). Blissful's expert's report states that the cause of the collapse was corrosion of the pipe: "If there was no corrosion of the pipe and its subsequent loss of integrity, there does not appear to be any other mechanisms to result in the exposure of the surrounding soils and there being impacted by flow within the storm drain. (Najewicz Report at 2). Blissful has offered a similar explanation of the incident elsewhere, including in an Interrogatory answer: "The collapse of the pipe resulted from hidden decay which occurred due to the presence of chemicals and salt in water which drained through the system . . ." (Def.'s Mot. Ex. 4 [Blissful Interrog.] ¶ 19, ECF No. 21-14).

    The Fifth Circuit considered this issue in a case where "an investigation revealed that underground cast-iron sewer and water pipes had massive leaks resulting in the expansion of soil beneath [the insured property]" and in which the insurer's consultant opined that "the pipe deterioration was likely caused by acids in the soil that corroded the pipes." Gen. Accident Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd., 288 F.3d 651, 652 (5th Cir. 2002). The Fifth Circuit held that the underground pipes did not constitute covered property but also noted that the corrosion exclusion in the policy at issue would have applied because "the probable cause" of the loss was "corrosion and deterioration caused by soil acidity." Id. at 657. The U.S. District Court for the District of Mississippi has also noted that, "[a]s a general rule, exclusions for damages caused by 'corrosion' precludes recovery for any damage caused to property because of contact with any corrosive agent." Bishop v. Alfa Mut. Ins. Co., 796 F.Supp.2d 814, 823 (S.D.Miss 2011).

    Here, Blissful has conceded that the Loss was caused by corrosion inside the pipe. As a result, the Court concludes that there is no genuine dispute of material fact regarding

the application of the Corrosion Exclusion and therefore no coverage under this coverage part.

### ii. Earth Movement Exclusion

Cincinnati also argues for the application of the Earth Movement Exclusion, which provides that Cincinnati will not cover losses for, among other things:

> Earth sinking (other than "sinkhole collapse"), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

(Policy at 25–26). Blissful argues that the corrosion of the pipes caused the collapse and that any "earth movement" was the result of the collapse, not its cause. But that reading misinterprets the prefatory language for this exclusion:

> We will not pay for the "loss" caused directly or indirectly by any of the following, unless otherwise provided. Such "loss" is excluded regardless of any other cause or event that contributed concurrently or in any sequence to the "loss".

(Policy at 25). That second sentence means that even if "earth movement" was not the predominant cause, if "earth movement" was a concurrent contributing cause at all, then the loss is excluded from coverage. Bao v. Liberty Mut. Fire Ins. Co., 535 F.Supp.2d 532, 540 (D.Md. 2008) (where an exclusion contains such language, "the Maryland Court of Appeals would not apply the efficient proximate cause rule, but would instead follow the plain language of the concurrent causation clause in the policy's exclusion.").

Here, the parties agree that corrosion was the efficient proximate cause of the collapse. But it stands to reason that earth movement contributed at least in part to the

14

collapse. After all, the pipes are underground, with earth above them. If the pipes were weakening or cracking due to corrosion, gravity would dictate that the weight of the soil above the pipe would cause it to collapse faster than if the pipe was bearing no weight. After the collapse, more earth would move, as Blissful contends, but that does not negate the earlier causation.

Blissful also argues that what occurred here was not "earth movement," but there is no genuine dispute of material fact that, as part of the collapse, there was earth "sinking" or "shifting" due to "the action of water under the ground surface." (Policy at 25–26). Blissful also cites to Lower Chesapeake Assocs. V. Valley Forge Ins. Co., 532 S.E.2d 325, 331–32 (Va. 2000) in support of its assertion that the Earth Movement Exclusion does not apply here or that the Policy is ambiguous on that point. But the Earth Movement Exclusion unambiguously applies to the Underground Property Coverage Extension because that Extension requires a Covered Cause of Loss. (Policy at 100). It does not apply to the Collapse Coverage Extension, where a Covered Cause of Loss is not a requirement for coverage. (Policy at 39).

As a result, the Court concludes that there is no genuine dispute of material fact that the Loss was at least in part caused by "earth movement" as defined under the Policy and is thus excluded from coverage.

### iii. Sinkhole

As just discussed, sinkholes are an exception to the Earth Movement Exclusion, that is, they are Covered Causes of Loss. (Policy at 25). To the extent Blissful alleges the collapse was due to a sinkhole in its Complaint and maintains that theory, Cincinnati

15

disputes it by pointing to the definition of "Sinkhole collapse" in the Policy and various experts' understandings of what a sinkhole is. The Court agrees the definition in the Policy language is clear and will therefore decline to address the experts' opinions.

Under the Policy, "'Sinkhole collapse' means the sudden settlement or collapse of earth supporting the Covered Property into subterranean voids created by the action of water on a limestone or similar rock formation." (Policy at 55). "This does not include: . . . [s]inking or collapse of land into man-made subterranean cavities." (Id.).

Here, Blissful is not contending that the collapse was "created by the action of water on a limestone or similar rock formation," but rather that it was caused by decay or corrosion within the pipe. Further, a pipe is clearly a man-made subterranean cavity. There is no genuine dispute of material fact, then, that a sinkhole collapse, as defined by the unambiguous words of the Policy, did not occur here. As a result, the Court concludes the Loss is not covered under the "Sinkhole collapse" exception to the Earth Movement Exclusion.

In sum, viewing the evidence in the light most favorable to Blissful, the Court concludes that Cincinnati has shown there is no genuine dispute of material fact that the collapse was not covered by any of the Policy provisions Blissful asserted in its Complaint. Accordingly, with respect to Blissful's breach of contract claim, the Court will grant summary judgment in favor of Cincinnati and against Blissful. The result is the same when the Court considers Blissful's Motion in the light most favorable to Cincinnati. The Court acknowledges this is a harsh result for Blissful, but the Court must interpret the contract as

written, Catalina Enterprises, 67 F.3d at 65, not based on one party's unilateral expectations. The Court will now turn to Blissful's estoppel claim.

    **3.    Estoppel**

Cincinnati argues that, even if Gregory intended to accept liability on behalf of Cincinnati and provide coverage for the Loss in his February 4, 2016 email, the email did not constitute waiver of Policy defenses or operate to estop Cincinnati from asserting any. Blissful counters that it detrimentally relied on Gregory's email, which is a dispute of fact for a jury to decide.

Under Maryland law, "wavier or estoppel may occur only when it does not create new coverage." Gordon v. Hartford Fire Ins. Co., 105 F.App'x 476, 484 (4th Cir. 2004) (quoting Allstate Ins. Co. v. Reliance Ins. Co., 786 A.2d 27, 32 (Md. 2001). "[A]n extension of coverage may only be created by a new contract." Md. Auto. Ins. Fund v. John, 16 A.3d 1008, 1016 (Md. 2011) (citing Sallie v. Tax Sale Investors, 814 A.2d 572, 575 (Md. 2002)). That is, "if the loss was not within the coverage of the policy contract, it cannot be brought within that coverage by invoking the principle of waiver or estoppel." Id. (quoting Prudential Ins. Co. v. Solomon Brookman, 175 A. 838, 840 (Md. 1934)).

Here, Gregory's email did not create a new contract. The Policy provides that its "terms can be amended or waived only by endorsement issued by us and made a part of the policy." (Policy at 7). The Court sees no evidence that Gregory's email constituted an "endorsement issued by [Cincinnati]" that was "made a part of the policy." Further, based on the Court's analysis above that the alleged provisions of the Policy do not cover the Loss, Gregory's email could not have created new coverage for Blissful's benefit. Gordon

17

v. Hartford Fire Ins. Co., 105 F.App'x at 484. Because there could be no waiver or estoppel, the Court need not consider Blissful's alleged detrimental reliance on Gregory's email.[5]

As a result, the Court concludes there is no genuine dispute of material fact with respect to Blissful's promissory estoppel claim. The result is the same when the Court considers Blissful's Motion in the light most favorable to Cincinnati. Accordingly, the Court will grant summary judgment in favor of Cincinnati and against Blissful on the promissory estoppel claim.

### III. CONCLUSION

For the foregoing reasons, the Court will grant Cincinnati's Motion for Summary Judgment (ECF No. 21) and deny Blissful's Cross-Motion for Summary Judgment (ECF No. 23). A separate Order follows.

Entered this 30th day of September, 2019.

/s/
George L. Russell, III
United States District Judge

---

[5] Even if estoppel was a possibility under Nationwide Mut. Ins. Co. v. Reg'l Elec. Contractors, 680 A.2d 547, 554 (Md.Ct.Spec.App. 1996) (holding that doctrine of estoppel must be applied to insurance coverage on a "case-by-case basis"), Blissful has not offered evidence of detrimental reliance sufficient to create a genuine dispute of material fact. Blissful incurred certain costs before Gregory's email (e.g., hiring Baker to investigate), and the rest of their costs were incurred after Cincinnati had indicated Gregory's email was not its final decision regarding coverage (e.g., retaining counsel) or would have been incurred regardless (e.g., obtaining an estimate of the damage).